UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


MORSIE PORTER                                           CIVIL ACTION

VERSUS                                                  NO: 05-262-SS

JIM NICHOLSON, SECRETARY OF THE
U.S. DEPARTMENT OF VETERANS
AFFAIRS

**ORDER**

DEFENDANT'S MOTION TO DISMISS AND/OR ALTERNATIVELY MOTION FOR SUMMARY JUDGMENT (Rec. doc. 37)

**GRANTED**

Before the court is defendant's motion to dismiss and/or for summary judgment. Rec. doc. 37. Having reviewed the pleadings, memoranda and relevant law, the court grants defendant's motion.

**PROCEDURAL BACKGROUND**

On January 31, 2007, the plaintiff, Morsie Porter ("Porter"), filed a complaint against Jim Nicholson, Secretary, U.S. Department of Veterans Affairs, pursuant to Title VII, 42 U.S.C. § 2000e. Rec. doc. 1. The parties consented to trial before a Magistrate Judge. Rec. doc. 12. Porter alleges workplace discrimination (race, sex and age) and retaliation against the Veterans Administration Medical Center in New Orleans ("VA Hospital"). Porter is an African American male born in 1948. He was employed as a Housekeeping Aid-WG-2. He claims he was subjected to discriminatory treatment when: (1) on July 31, 2001, he was given an unwarranted absent without leave charge;

(2) on April 2, 2002, his duty hours were changed; (3) in December 2001, he was denied overtime; and (4) he was not selected for supervisory housekeeping positions on April 19 and December 4, 2002.

## LEGAL STANDARD

The parties presented affidavits and other evidence. Pursuant to Fed. R. Civ. P. 12(b)(6), the motion to dismiss shall be treated as a motion for summary judgment. Fed. R. Civ. P. 56 provides in pertinent part that summary judgment will be granted when "... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). Lujan v. National Wildlife Federation, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189 (1990). To that end, the court must "view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." Wyatt v. Hunt Plywood, 297 F.3d 405, 409 (5th Cir. 2002). Where the record taken as whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986); Washington v. Allstate Ins. Co., 901 F.2d 1281 (5th Cir. 1990).

Furthermore, the party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," but need not negate the elements of the non-movant's case. Celotex, 106 S.Ct. at 2553; see Lujan, 110 S. Ct. at 3187. If the moving party fails to meet this initial burden, the motion must be denied, regardless of the non-movant's response. If the movant does,

however, meet this burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. Celotex, 106 S.Ct. at 2553-54. A dispute over a material fact is genuine, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Kee v. City of Rowlett Texas, 247 F.3d 206, 210 (5th Cir. 2001).

This burden is not satisfied with "some metaphysical doubt as to the material facts," Matsushita, 106 S.Ct. at 1356, by "conclusory allegations," Lujan, 110 S. Ct. at 3180, by "unsubstantiated assertions," Hopper v. Frank, 16 F.3d 92 (5th Cir.1994), or by only a "scintilla" of evidence, Davis v. Chevron U.S.A., Inc., 14 F.3d 1082 (5th Cir.1994). The court resolves factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. The court does not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. See Lujan, 110 S. Ct. at 3188. Summary judgment is appropriate in any case "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the non-movant." Armstrong v. City of Dallas, 997 F.2d 62 (5th Cir.1993). If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted. See Evans v. City of Bishop, 238 F.3d 586, 588-89 (5th Cir. 2000).

In Fierros v. Texas Dept. of Health, 274 F.3d 187 (5th Cir. 2001), the Fifth Circuit cautioned that summary judgment is not favored in claims of employment discrimination and that the Supreme Court in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 2110 (2000), emphasized the paramount role that juries play in Title VII cases, stressing that in evaluating summary judgment evidence, courts must refrain from the making of credibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts, which are jury functions, not those of a judge.  Fierros, 274 F.2d at 190-91.

## FACTUAL BACKGROUND

Morsie Porter was born in New Orleans on November 16, 1948.  Rec. doc. 38, Ex. 2 at pp. 43-44.[1]  He completed high school in 1966.  Rec. doc. 38, Ex. 2 at p. 44.  He served in the Marine Corps for more than ten years.  Rec. doc. 38, Ex. 2 at p. 44.  At the time of his honorable discharge he was a staff sergeant in charge of mechanical equipment used in aircraft.  Rec. doc. 38, Ex. 2 at p. 44 and Rec. doc. 37, Ex. 11 at p. 43.[2]  In 1976, he returned to New Orleans.  Rec. doc. 38, Ex. 2 at p. 44.  From 1976 to 1977, he taught school (motor vehicle repairs) for Total Community Action. Rec. doc. 38, Ex. 2 at pp. 44-45.  From 1977 to the early 1980s, he worked for Exxon on platforms testing and maintaining the flow of oil and gas.  Rec. doc. 38, Ex. 2 at p. 45.  He attended Nicholls State University part-time.  In 1981, he obtained a two year associate degree in petroleum services. Rec. doc. 37, Ex. 11 at p. 19.  Although he stated he was on the dean's list for a year, his transcript did not reflect this; rather, it reflected that he was on probation.  Rec. doc. 37, Ex. 11 at p. 19.  In the 1980s, he had sales jobs, including selling automobiles.  Rec. doc. 38, Ex. 2 at p. 46.  From August 1992 to March 1998, he was self-employed and did not earn enough to pay income taxes. Rec. doc. 37, Ex. 11 at p. 19.  Porter began working at the VA Hospital on April 10, 2000.  Rec. doc.

---

[1] Porter was deposed by the defendant in this action on November 21, 2006.  The transcript of the deposition was submitted by Porter with his opposition.  Rec. doc. 38, Ex. 2.

[2] There was an EEO hearing in New Orleans on May 25, 2004, on Porter's claims of discrimination for the April 19, 2002 non-selection for a temporary one year position as a housekeeping aid supervisor and the December 4, 2002 non-selection for a permanent position as a housekeeping aid supervisor.  The transcript of this proceeding appears at Rec. doc. 37, Ex. 11.

37, Ex. 11 at p. 17.

During the pertinent period, Jeannette Butler was the director for Facilities Management Service Line at the VA Hospital. Rec. doc. 37, Ex. 11 at p. 20. Her responsibilities included the sanitation program and the environmental care department. Rec. doc. 37, Ex. 11 at p.21. In November 2000, Cassandra Holliday became the supervisory program specialist for environmental management. Rec. doc. 37, Ex. 11 at p. 27. Butler was Holliday's immediate supervisor. Rec. doc. 37, Ex. 11 at p. 27. The environmental care department was organized into teams. Each team was headed by a housekeeping aid supervisor. Rec. doc. 37, Ex. 11 at p. 30. Welton Corey was a long time housekeeping aid supervisor. Rec. doc. 37, Ex. 11 at p. 31.

When Holliday began working in environmental management, Alexander Narcisse and Porter both worked as housekeeping aids. Narcisse began working at the VA Hospital about a year before Porter. Rec. doc. 37, Ex. 11 at pp. 17-18. From March 2001 to June 2001 Narcisse worked as a temporary housekeeping aid supervisor. Rec. doc. 37, Ex. 11 at pp. 31 and 35. Holliday selected Narcisse for this temporary position on the basis of the recommendation of his immediate supervisor and team leader, Corey. Rec. doc. 37, Ex. 11 at p. 31. In October 2001, Holliday selected Narcisse to fill a temporary one year position as housekeeping aid supervisor. Rec. doc. 37, Ex. 11 at pp. 33-35. Porter did not apply for this position. Rec. doc. 37, Ex. 11 at p. 34. Narcisse was selected over two other qualified applicants for the position, Preston Martin and Maurice Richard. Rec. doc. 37, Ex. 11 at p. 34.

On January 7, 2002, an announcement for another temporary supervisory housekeeping aid was posted. Rec. doc. 37, Ex.5 at p. 48 (Defendant's exhibit 14). Porter was one of three persons

identified as best qualified. Because of a budget deficit, the position could not be filled, and therefore no one was selected for the position. Rec. doc. 37, Ex. 4 at p. 50 (Defendant's exhibit 15). On November 12, 2002, the announcement was made for the position at issue; the permanent position of supervisory housekeeping aid. Rec. doc. 37, Ex. 9 at p. 40 (Defendant's exhibit 27). Narcisse was selected by Holliday for this position.

### **RACE DISCRIMINATION**

Porter's complaint states:

> Defendant engaged in discriminatory employment practices which emanates (sic) from a common plan or scheme uniformly applied to Black employees in general and in particular to Plaintiff as will be shown herein.

Rec. doc. 1 at p. 2. Porter alleges that he was not selected for a supervisory housekeeping position and the position was assigned to a Caucasian employee. He alleges that all acts of discrimination were "due to his race (Black), age and sex. . . . ." Id. at p. 2. He refers to race, sex and age discrimination in paragraphs 10 and 11 of the complaint. Id. The defendant's motion for summary judgment is silent on the issue of race discrimination. In his opposition memorandum, Porter states he brings claims based on his race, age and gender and refers to himself as a black male. Rec. doc. 38 at p. 5. His statement of undisputed facts (no. 9) provides that the VA Hospital "stifled Morsie Porter's promotion abilities because of his age, race, gender and prior EEO activities. . . ." Rec. doc. 38 at p. 3. The defendant's reply memorandum is again silent on the issue of race.

Porter identified Holliday as the person who discriminated against him. Holliday is African American. Rec. doc. 38, Ex. 2 at p. 53-54. The position that he sought was filled by Narcisse, who is also African American. Id. at 58. The October 16, 2003 and May 27, 2004 EEO decisions

6

demonstrate that the only issues raised by Porter concerned age, gender and reprisal for prior EEO activities. Rec. docs. 37, Ex. 8 at pp. 1-7 and 37, Ex. 12 at pp. 1-4. After reviewing all of the evidence submitted by the parties, the court is unable to find any evidence supporting Porter's allegations of discrimination based on race. The claims for race discrimination will be dismissed with prejudice.

Pursuant to Fed. R. Civ. P. 11(b), an attorney certifies that, to the best of his knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions have evidentiary support. Within seven (7) working days of the entry of this order Porter's counsel shall submit the basis for making the allegations of race discrimination. If the submission demonstrates that Porter's counsel did not comply with Rule 11(b), monetary sanctions may be imposed.

## ULTIMATE EMPLOYMENT DECISIONS

The defendant contends that the absent without leave ("AWOL") and change of tour claims were not ultimate employment decisions. Title VII prohibits employers from discriminating against employees on the bases of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). Title 14 U.S.C. § 2000e-16(a) governs employee discrimination actions by federal employees, providing in pertinent part:

> All personnel actions affecting employees or applicants for employment in military departments ... executive agencies ... shall be made free from any discrimination....

Id. The statute does not define the term personnel actions as it relates to claims against the government. In Dollis v. Rubin, 77 F.3d 777 (5th Cir. 1995), a retaliation case, the Fifth Circuit held that, "Title VII was designed to address ultimate employment decisions, not to address every

7

decision made by employers that arguably might have some tangential effect upon those ultimate decisions." Id. at 781-82.  Only "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating" satisfy the adverse employment action element.  See Mattern v. Eastman Kodak Co., 104 F.3d 702, 707 (5th Cir.), cert. denied, 522 U.S. 932, 118 S.Ct. 336 (1997).  See also Washington v. Veneman, 2004 WL 170315 (E.D.La.)(Duval, J.) (claims for rude behavior from supervisors, disclosure of personal information by supervisors, assignment of duties, undeserved performance ratings and denial of a performance award were not ultimate employment decisions).

The AWOL claim relates to an incident that occurred on July 31, 2001.  Wendell Corey, a supervisor, issued a letter notifying Porter that he was observed standing outside a building at the VA Hospital at around 8:15 a.m. in a non-working status.  Porter's shift did not end until 8:30 a.m.  Inasmuch as he did not seek permission from a supervisor to be away from his duty station, he was deemed AWOL for fifteen minutes.  Porter's pay was not docked for this incident.  Rec. doc. 37, Ex. 2 (Defendant's Statement of Undisputed Facts - Nos. 8 and 10).

The change of tour claim relates to an incident in April 2002, when Porter's duty hours were changed.  His tour from 11:00 p.m. to 7:30 a.m. was changed to from midnight to 8:30 a.m.  Many of the housekeeping staff also had their tours changed.  Management reported that the change was made to increase the operation's efficiency by putting more experienced workers in patient care and other high profile areas and give less experienced workers an opportunity for more training.  Rec. doc. 37, Ex. 2 (Defendant's Statement of Undisputed Facts - Nos. 15-17).

Porter argues that the AWOL and change of tour claims were precursors to the decision to

deny him a promotion, an ultimate employment decision. This argument does not respond to the fact that under Dollis, the AWOL and change of tour discrimination claims do not involve ultimate employment decisions. They will be dismissed with prejudice.

## APRIL 19, 2002 NON-SELECTION

On January 7, 2002, the VA Hospital posted a vacancy announcement for a supervisory housekeeping position. The position was temporary and not to exceed one year. Rec. doc. 37, Ex. 5 at p. 48 (Defendant's exhibit 14). Porter applied for the position and was one of three persons that Human Resources identified as best qualified. The other two were James Craig and Jacqueline Jones. Human Resources was notified that, because of a budget deficit, the position could not be filled so no one was selected for the position. Rec. doc. 37, Ex. 5 at p. 50 (Defendant's exhibit 15). Porter does not dispute these facts. The McDonnell Douglas[3] formula demands that the plaintiff demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought. International Broth. of Teamsters v. U.S., 431 U.S. 324, 97 S.Ct. 1843, 1866 at n. 44 (1977). Porter's April 19, 2002 non-selection discrimination claim will be dismissed with prejudice.

## OVERTIME CLAIM

Porter contends that in December 2001 his immediate supervisor, Preston Morton, asked him to perform overtime and he expressed his willingness to do so. Morton submitted his name to Holliday. She chose Jones for the overtime instead of Porter. Jones was an African American

---

[3] McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973).

9

female who was somewhat younger (45-47) than Porter. In December 2001, Jones did about 67 hours of overtime on the floor to which Porter was assigned. Rec. doc. 37, Ex. 6 at pp. 22-24.[4]

To establish a prima facie case of disparate treatment, the plaintiff must show that: (1) he was a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) others outside the class were treated more favorably than he. Washington, 2004 WL 170315, *4. If the overtime work is viewed as a type of non-promotion, the fourth element requires that Porter demonstrate that someone outside the protected class received the overtime work. Id.

Jones is a female, so Porter presents a prima facie case of gender discrimination on the overtime claim. At the October 16, 2003 EEO hearing, Porter testified Jones was between 45 and 47. At the time of the hearing, Porter was 55. Although Jones was above the age of 40, the difference in ages is significant enough to infer age discrimination. O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 116 S.Ct. 1307, 1310 (1996). Porter demonstrated a prima facie case of age discrimination.

The burden shifts to the defendant to produce evidence that its actions were justified by a legitimate nondiscriminatory reason. Raggs v. Mississippi Power and Light Company, 278 F.3d 463, 467-68 (5th Cir. 2002). Holliday testified that Jones was a highly valued and excellent employee with good floor care skills. Rec. doc. 37, Ex. 7 at p. 21(74). She testified that Jones was superior to Porter in terms of floor care. Jones had almost twenty years of experience at another VA

---

[4] On October 16, 2003, there was an EEO proceeding in New Orleans on Porter's AWOL, change of tour hours and denial of overtime claims. The transcript is found at Rec. docs. 37, Ex. 6 and 37, Ex. 7(Defendant's exhibit 17).

facility where she was part of a floor care team. Id. at pp. 22(75). The defendant demonstrated that the decision to award Jones the overtime instead of Porter was justified by a legitimate non-discriminatory reason.

> [T]he plaintiff may still avoid summary judgment if she demonstrates a genuine issue of material fact whether the legitimate reasons proffered by the defendant are not its true reasons, but instead are a pretext for discrimination.

Septimus v. University of Houston, 399 F.3d 601, 609 (5th Cir. 2005)  Porter contends that he was better qualified than Jones for the overtime work.  In Celestine v. Petroleos De Venezuella SA, 266 F.3d 343 (5th Cir. 2001), the Fifth Circuit stated that at the third prong of the McDonnell Douglas framework,

> [A] plaintiff may survive summary judgment and take his case to the jury by providing evidence that he was clearly better qualified than the employee selected for the position at issue.  The single question for the trier of fact is whether the employer's selection of a particular applicant over the plaintiff was motivated by discrimination, and evidence of the plaintiff's superior qualification is thus probative of pretext.  However, the bar is set high for this kind of evidence because differences in qualifications are generally not probative evidence of discrimination unless those disparities are of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.

Id. at 356-57 (Citations and quotation marks omitted).

Porter has not presented competent summary judgment evidence that he was clearly better qualified than Jones for the overtime work. Jones had more than twenty years experience at another VA facility where she was part of a floor care team. In December 2001 when the overtime decision was made, Porter had about eight months experience on a floor care team. Porter's conclusory allegation that Holliday's decision to grant the overtime to Jones was motivated by gender or age discrimination is not sufficient evidence of pretext. Porter's claim of gender discrimination must

11

be dismissed with prejudice. His claim of age of discrimination with respect to the overtime decision must also be dismissed with prejudice.

## DECEMBER 4, 2002 NON-SELECTION

On November 12, 2002, the VA Hospital posted a vacancy announcement for the position of supervisory housekeeping aid. Rec. doc. 37, Ex. 9 at p. 40 (Defendant's exhibit 27). Of the applicants for the position, Human Resources determined that five were qualified: two women and three men, including Morsie Porter and Alexander Narcisse. Holliday selected Narcisse as the best qualified candidate. Rec. doc. 37, Ex. 9 at p. 43. At that time, Narcisse was 39 years old. Rec. doc. 37, Ex. 11 at p. 3. As a result of Narcisse's age, Porter presents a prima facie case of age discrimination.

Holliday testified she was familiar with both Porter and Narcisse. Rec. doc. 37, Ex. 11. at p. 27 and p. 31. She testified that: (1) she received unfavorable comments from customers (visitors, medical staff and patients) regarding the areas of the facility for which Porter was responsible; (2) Porter did not comply with policies and procedures; (3) she did not believe that Porter could successfully function as a supervisor; (4) she did not see him as a team leader; and (5) he had problems with one of the leading vendors for chemical supplies for the housekeeping department at the VA Hospital. Rec. doc. 37, Ex. 11 at p. 28-30 and pp. 32-35. She further testified that: (1) Narcisse performed well in a temporary supervisory position; (2) he provided assistance to other supervisors; (3) he had a good rapport with the vendors that came to the facility; and (4) he was involved in other programs within the facility, such as the Black Employee Program, and outside of the facility, such as the Boy Scouts. Rec. doc. 37, Ex. 11 at pp. 31-32 and p. 33. She stated:

> Mr. Narcisse has been a major asset to team number three by virtue of his awareness of who and what his role as a housekeeping aid is and how greatly that impacts the medical center's environment. His personal appearance, his maintenance of equipment, and his performance in his assigned areas combine to make him a model employee. His understanding of the importance of his role as a VAMC employee is evident by his actions. . . .

Rec. doc. 37, Ex. 11 at p. 38(149). The defendant has demonstrated that the decision to promote Narcisse instead of Porter was justified by legitimate nondiscriminatory reasons.

Porter must demonstrate a genuine issue of material fact as to whether the defendant's reason is not true, but instead was a pretext for age discrimination. Septimus, 399 F.3d at 609. He contends that he was better qualified than Narcisse for the permanent supervisory position. He has not presented competent summary judgment evidence that he was clearly better qualified than Narcisse for the position. Celestine, 266 F.3d at 356-57. Narcisse began working as a housekeeping aid at the VA Hospital about a year before Porter. Narcisse held temporary supervisory positions twice: the first was for about ninety days from March 2001 to June 2001; and the second was for a year beginning in October 2001. Narcisse performed well in the temporary supervisory positions. Porter had no supervisory experience at the VA Hospital. Based on his resume, his only prior supervisory experience was in the Marine Corps for nearly twenty-five years earlier. For most of the ten years preceding his employment with the VA Hospital, Porter was unemployed or earned so little that he was not required to pay income taxes. Porter's conclusory allegation that Holliday's decision to promote Narcisse was motivated by age discrimination is not sufficient evidence of pretext. Porter's claim of age discrimination must be dismissed with prejudice.

### RETALIATION

Porter contends that Holliday's decisions to award overtime to Jones and to promote Narcisse

to the permanent supervisory position were made in retaliation for his prior EEO activity. The elements of his prima facie evidentiary showing are: (1) he engaged in a protected activity; 2) an adverse employment action occurred; and 3) a causal link existed between the protected activity and the adverse action. Septimus, 399 F.3d at 610. It is undisputed that Porter engaged in such activity as he filed many EEO cases for himself and for others. Rec. doc. 37, Ex. 11 at p. 18, and Rec. doc. 37, Ex. 6 at p. 12-14. The denial of overtime and the December 2002 non-promotion decision are adverse employment decisions and there was EEO activity prior to both decisions.

The burden shifts to the defendant to state a legitimate non-retaliatory reason for its actions. Septimus, 399 F.3d at 610. Butler stated that Jones was the best qualified candidate for the overtime and Narcisse was the best qualified candidate for the permanent supervisory position. "At this point any presumption of retaliation drops from the case. . . ." Id. at 610-11.

At this step in the analysis, Porter must offer sufficient evidence to create a genuine issue of material fact that either: (1) defendant's reason is not true but is instead a pretext for discrimination based on retaliation; or (2) the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected activity. The latter is described as the mixed-motive alternative. Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004). Porter does not present a mixed motive case regarding his retaliation claim. Instead, his opposition alleges that Holliday's stated reasons for her decisions were pretexts for retaliation. Porter states that Holliday's "prior actions against Mr. Porter were but pretext for discrimination under Title VII" and Holliday's explanations "were merely pretext" for his prior participation in filing EEO complaints. Rec. doc. 38 at pp. 7 and 11.

In his EEO complaints, Porter sought the dismissal of at least five people including Butler, Holliday, Corey and Narcisse  Rec. doc. 37, Ex. 11 at p. 18.  He testified that:

> The reason I asked them to be removed was my seriousness of what I'm talking about.  We are talking about a job here, and I'm upset simply because with what goes on now, I don't make enough money to support myself, and I look for a promotion to do that.  We have got people now that the new supervisors they hired right off the street, they have no time with at least the VA; but you know, they walk in making 18, $19 an hour.  I'm stuck at $9 and a penny an hour.  For me, that has lowered my standards of living.  I'm looking to do better than what I'm doing now, but at this particular time I can't do that because I'm not allowed to be promoted; I'm not allowed to get an award; I'm not allowed to do overtime.  So there's nothing that I can do to make extra money, and the way that my shift changes, you know, I may work six weeks during the day and six weeks back in the evening.  It just changed again.  So if I wanted a part-time job, how could I work, you know?  So that's my reasons for requesting what I'm requesting.  Just to make a living.  That's all I want to do.  I've got a federal job and can't afford insurance that I can't pay for.

Rec. doc. 37, Ex. 11 at p. 18 and p. 43.  He testified that he did not go to work at the VA Hospital just to be a housekeeper.  He could see himself in management, but he was not there "just to swing a mop every day" until he retired.  Rec. docs. 38, Ex. 2 at p. 65, and 37, Ex. 6 at p. 12.     Porter explained that Holliday and he did not see eye-to-eye:

> [O]ne of the main reasons is the fact that, you know, I'm the type if you tell me something and I don't know it, I don't understand it, I'm going to ask you questions.  But don't give me a, well because I said so answer.  I want to know why I am doing this.
>
> And one of the things that I did know, you can manage anybody.  All right?  It matters not what the job is, you can manage.  But in this particular case being housekeeping, there's a variety of things that can happen.  There's a wealth of knowledge that you have to know in order to do the job right.  And Ms. Holliday did not know it.  And, you know, if we'd ask her, or if I'd ask her a question about it, I pose a threat to her, because assuming – they assumed that I knew what I was talking about.  And I would not ask a question unless I didn't know the answer.  All right?
>
> In most cases I knew the answers to the questions I'd ask, but I'm asking out of curiosity, not to test your knowledge but maybe I'm not sure.  But if you don't

>    know, who do I go to? And you're my upper line supervisor so who's going to give
>    me the answer to the question I need?

Rec. doc. 38, Ex. 2 at p. 54. He testified that "because someone fears what I know, possibly, that I should be held back." Rec. doc. 37, Ex. 7 at p. 40. He described Holliday's tenure as a type of dictatorship. Rec. doc. 38 at p. 60. He refused to tuck in his shirt as requested, because he needed to cool his body. Rec. doc. 38 at p. 65. He did not follow instructions about wearing a cap and using cologne. Rec. doc. 38 at p. 65. He said that he and others would not take a lot of nonsense. Rec. doc. 37, Ex. 6 at p. 21. In explaining this term he said:

>    I said "nonsense" for the sake of saying another word. But what I'm interpreting that to be, or the way it's – the way that I can explain it, is the fact that we are outspoken people. And simply, I mean, I – I can talk or deal with anybody. I don't have a problem with that. But I will not be used, okay. If I find out that you're trying to use me, I'm going to – I'm going let you know. I'm going to speak up for myself. I will stand up.
>
>    And in most cases, the people that were transferred were like myself; they will stand up.
>
>    And its my experience, dealing with Ms. Holliday, when you stand up and speak for yourself, then that's a problem for her. And then you have to suffer the repercussions on it.

Rec. doc. 37, Ex. 6 at p. 28-29.

In support of his claim that he was denied the promotion in reprisal for his prior EEO activity, Porter cites Corey's testimony that about two years prior to the posting of the November 12, 2002 vacancy announcement or shortly after Holliday was appointed to her position in environmental management, there was a temporary supervisor position that needed to be filled. Holliday spoke to Corey about the position and discussed who he liked and did not like for the position. Rec. doc. 37, Ex. 11 at p. 5. Corey testified:

16

> I do recall one particular conversation with Miss Holliday about filling that (temporary) position after Joe Robinson and Mervin Pollard had left, and we had those two (temporary) positions to fill as a matter of fact; and we were discussing likely candidates, people we thought would be good, and I suggested Morsie Porter, and to that Miss Holliday responded, well – well, let me preface this. I told her, I said, well, I have a candidate in mind. I said, you may think I'm crazy for suggesting him, I said, but I think Morsie Porter would be good. She said, well, you must be crazy. I said, why so? She said, I'm not going to promote anybody that's fighting me, and my reasoning to her was well, if you promote him, you will be out of the union – out of the bargaining unit rather, and you will be his immediate supervisor; you will have a year's probationary period, and if you don't cut the mustard or make the grade, you can do what you have to; but my opinion here was to give him a shot. She said no. . . ."

Rec. doc. 37, Ex. 11 at p. 5.  Holliday rejected Corey's suggestion.  She saw it as a strategy to quiet Porter.  She testified that,

> [W]e are trying to change the atmosphere of a department that is under performing, and you are asking that I promote someone who is not performing, whose area is frequently deficient, who is not a team player, who is contentious and seems to have contempt for that which he desires also to be a part of.  That would be crazy.

Rec. doc. 37, Ex. 11 at p. 41.  Porter contends that this demonstrates that Holliday acted in retaliation for his protected EEO activity in denying him the permanent position in 2002.

In <u>Septimus</u>, the Fifth Circuit stated:

> The proper standard of proof on the causation element of a Title VII retaliation claim is that the adverse employment action taken against the plaintiff would not have occurred but for her protected conduct.  This court has consistently held that in retaliation cases where the defendant has proffered a nondiscriminatory purpose for the adverse employment action the plaintiff has the burden of proving that but for the discriminatory purpose he would not have been terminated.

399 F.3d at 608.  This standard is more stringent than the motivating factor test.  <u>Id</u>.; and see also <u>Strong v. University Health Care System, L.L.C.</u>, ____ F.3d ____, 2007 WL 891148 (5th Cir. 2007).  The question is whether Porter put forth legally sufficient summary judgment evidence that he

would have been awarded the overtime and promoted to the permanent supervisory position but for his EEO activity, including his demand that Butler be terminated.

Porter's testimony demonstrates that he would not accept Holliday's instructions without question. Rec. doc. 38, Ex. 2 at p. 54. He believed that he knew more than she did about housekeeping. Rec. doc. 38, Ex. 2 at p. 54. Even though he knew the answers to his questions, he asked them anyway. Rec. doc. 38, Ex. 2 at p. 54. He suggested that she feared what he knew. Rec. doc. 37, Ex. 7 at p. 40. He refused to follow her instructions on his dress and personal grooming. Rec. doc. 38, Ex. 2 at p. 65. He described himself as outspoken. Rec. doc. 37, Ex. 6 at p. 28-29. He refused to take a lot of "nonsense" from Holliday. Rec. doc. 37, Ex. 6 at p. 28-29. If Porter conducted himself in this manner as housekeeping aid, the only possible conclusion for the trier of fact is that a promotion to a temporary supervisory position on a floor care team would only embolden Porter. Corey's testimony is not substantial evidence of pretext.

"Employers are sometimes forced to remove employees who are performing poorly, engaging in improper work conduct, or severely disrupting the workplace." Strong v. University Health Care System, 2007 WL 891148, *13-14 (5th Cir. 2007). Porter's own testimony demonstrates that he engaged in such conduct. Porter would have his prior EEO activity act as a shield or cover to permit him to ignore his superiors' instructions or otherwise engage in disruptive activity. His view is that his EEO activity prevents his employer from considering pertinent conduct in evaluating applicants for overtime or for a promotion. Such a result is not consistent with the Fifth Circuit's requirement that Porter demonstrate that the adverse employment action taken against him would not have occurred 'but for' his protected conduct. Septimus, 399 F.3d at 608. Porter's retaliation

18

claim shall be dismissed with prejudice.

## HUNT AFFIDAVIT

Porter submitted the affidavit of Al Hunt, III with his opposition. Rec. doc. 38, Ex. 2 at pp. 1-5. Hunt's affidavit is dated November 10, 2004. It was submitted in connection with the complaint of Ralph Saunders before the EEOC. Hunt began working at the VA Hospital as a supervisor in November 2003. He reported to Holliday for about six months until she transferred to human resources in April 2004. Holliday was replaced by Ms. Cosy. Both Holliday and Cosy reported to Butler. In October 2004, or less than a year after his arrival, Hunt resigned. In May 2004, he filed an EEO complaint against Butler for discrimination. Rec. doc. 38, Ex. 2 at pp. 1-5.

Hunt testified that Saunders and Isaac Decatur were placed on his team "from a list prepared by Ms. Holiday after approval by Ms. Butler that I later learned were on a black list." Rec. doc. 38, Ex. 2 at p. 1. The affidavit asserts that the black list was Butler's list. In addition to Saunders and Decatur, Hunt reports that Porter and three others, two men and one woman, were on the black list. These persons were black listed because they had filed EEO complaints against Butler and she wanted the supervisors to work to get rid of them. Rec. doc. 38, Ex. 2 at p. 2. Most of the affidavit addresses issues concerning Saunders. Hunt states that Butler, Holliday and Cosy abused the rules and wrongfully retaliated against their subordinates. Rec. doc. 38, Ex. 2 at pp. 3-4.

The defendant argues that the evidence presented by Hunt is inadmissible because Hunt cannot testify to the existence of a black list in 2000 or in 2002. Porter began working at the VA Hospital in April 2000. Hunt did not begin working at the VA Hospital until three years later.

There is no evidence that Butler participated in the decision to select Narcisse for the temporary position in November 2000 or the permanent position in December 2002.

Pursuant to Fed. R. Evid. 602, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Hunt has no personal knowledge of Holliday's practices in November 2000 or December 2002. Rule 56(e) provides that "opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Hunt's affidavit may not be considered in opposition to defendant's motion for summary judgment.

## CONCLUSION

IT IS ORDERED that defendant's motion to dismiss and/or for summary judgment is GRANTED and all of Porter's claims are dismissed with prejudice pursuant to Fed. R. Civ. P. 56.

New Orleans, Louisiana, this 3rd day of April, 2007.

_____
**SALLY SHUSHAN**
**United States Magistrate Judge**